# DOS – OBO INTERNAL INVESTIGATIVE REPORT

1.  The attached DOS-OBO investigative report based on erroneous information and theory of HEARSAY. The investigation has not been conducted in the true spirit of the original complaint and provided safe exit to all accused persons.

2.  The report indicates that the investigators have not made any effort to contact and investigate any witnesses in this case. The report does not include any counter documented evidences offered by the accused parties.

3.  The report includes the investigation references conducted by DOS-OIG separately. However, in fact DOS-OIG has not completed their investigation and the report has not been shared with the complainant. Therefore the internal investigation report does not based on the facts.

4.  The accused party has the full knowledge that the complainant is trying to file a complaint against DOS-OBO and SRC. The accused party ganged up against the complainant, retaliated and terminated the complainant's contract employment after 11 months and 7 days. The employment agreement was for 18 months at Karachi Pakistan.

Exhibit "E"
pages "51" including this page

9·4·17



United States Department of State
*Office of Civil Rights*
Washington, DC 20520-7428

March 17, 2017

Murad Qayyum
68 Longfield Drive
Hillsborough, NJ 08844

**Re: EEO Case Number: DOS-0025-17**

Dear Mr. Qayyum:

In reference to your correspondence dated March 3, 2017, to the Office of Civil Rights (S/OCR), this is to advise you that pursuant to 29 C.F.R. § 1614.106(d), your above-referenced discrimination complaint is hereby amended to include reprisal as an additional basis, and revised to include specific dates to the claims:

**AMENDED AND REVISED ALLEGATIONS**

**Because of your race (unspecified), national origin (American-Pakistani), religion (Muslim), and as acts of reprisal for prior protected activity and opposing discriminatory policies and practices, you were discriminated against when:**

1. **On September 7, 2016, you were removed from your position as a third-party contractor with SRC; and**

2. **As recently as September 7, 2016, you were subjected to a hostile work environment, characterized by, but not limited to inappropriate comments, humiliation, and false accusations.**

It is essential that you notify this office in writing within 5 calendar days from receipt of this letter if you believe this letter does not correctly identify the circumstances surrounding your complaint of discrimination. Please state in your communication the specific reason(s) why you believe the issues have not been properly articulated. You may propose an alternative formulation. If we have

2

received nothing in writing from you within the allotted timeframe, we will proceed with an investigation consistent with the line of inquiry proposed above.

Your amended allegations will be forwarded to the contract investigator for consolidation and investigation with your pending complaint. Upon completion of the Report of Investigation (ROI), you will be provided a copy of the report along with an explanation of your further procedural rights.

Pursuant to 29 C.F.R. § 1614.106(e)(2), your decision to amend your pending complaint with additional allegations extends the 180-day processing time of your complaint within the earlier of 180 days after the last amendment to the complaint or 360 days after the filing of the original complaint. However, you still have the right to request a hearing from an administrative judge on the consolidated complaint any time after 180 days from the date you filed your first complaint.

Claudette Rhone, the EEO Specialist assigned to your case, retains responsibility for the case and will be monitoring the performance of the contract investigator.

If you need information or assistance at any stage of the processing of your complaint, please contact Claudette Rhone, or Glenn Budd, Chief, Intake and Resolution section, at (202) 647-9295.

Sincerely,

Pamela J. Britton
Attorney-Adviser

# COMPLAINANT'S REBUTTAL STATEMENT

**Date:** June 17, 2017                    **Agency Case No.:**   DOS-0025-17

**Complainant's Name:** Murad A. Qayyum

I have been advised of response related to my complaint of discrimination. I desire to include further comments as shown below.

Rebuttal statement starts here.

1.      The Report of Investigation (ROI) indicates accused party as witnesses (Steve Brda, Steve Foster, and Stacy Price).
The witnesses in this case were reported as Nisar Alvi/SRC, McSherry Catherine/Post Management Officer, Patrick Miller/Post RSO, Matt Hamersville,/SRC,  Hakan Arnas/Epik,, Cafer/Epik, Ibrahim/Epik and Neilsoy/Epik.
The Report of Investigation (ROI) indicates that the Investigator has made no effort to contact and investigate any witnesses as documented in original complain dated November 24, 2016.

2.      The Report of Investigation (ROI) indicates that the investigator has made no effort to frame the questionnaire adequately to reflect the allegation as documented in the complaint dated November 24, 2016 and DOS letter dated March 17, 2017 against Act of Reprisal, Hostile Work Environment and Humiliation. (Allegation No. 4, 5, 7 and from 7.1 to 7.5 complain dated 11/24/17).
The investigator framed 78 questions for the complainant. He responded 100%.
The investigator framed 59 questions for the Steve Brda. He responded 57%.  Most of the questions were irrelevant that does not pertain to this case.
The investigator framed 50 questions for the Steve Foster. He responded 84%. Most of the questions were irrelevant and dose not pertains to this case.
The investigator framed 31 questions for the Stacy Price. She responded 77%. Most of the questions were irrelevant and does not pertain to this case.

3.      The Report of Investigation (ROI) does not include the responses offered by the accused party Steve Brda during Informal Investigation wherein Steve Brda admitted that he has made the comments about the complainant's Origin.

1

Agency Case No. DOS-0025-17
Rebuttal Page 2 of 2

4.    The contacting Officer Nadia Riley was not accused in the original complains.
      She made the decision based on incorrect & false information fed by Steve
      Brda & Stacy Price.

5.    The Report of Investigation (ROI) indicates that all included in the accused
      party failed to provide any documented evidences against the complainant.
      However, the complainant has provided documented evidences against each
      allegation as documented in the complaint dated November 24, 2017.

## CONCLUSION:

The Report of Investigation ROI) indicates that the investigator conducted the
investigation via framing the questionnaire only and made no effort to contact all
parties involved including the main witnesses in this case. The investigator has
either eliminated or not capture the allegations properly in the questionnaire that
were framed for accused parties in there Affidavit B, C & D as documented in
complain dated November 24, 2016 and Department of State letter dated March 17,
2017 regarding Reprisal, Hostile Work Environment & Humiliation.

The accused parties failed to provide any documented evidences in there Affidavits
B, C & D. Their responses were based on either verbal or assumptions.

The complainant has concluded that the Report of Investigation (ROI) is incomplete.

The complainant strongly believed that Steve Brda, Steve Foster and Stacy Priced
ganged up against the complainant retaliated against him and removed him from
the site after 11-monts and 15-days. Therefore the complainant is requesting the
Agency for equitable adjustment due to financial damages in favor of complainant.

I declare under penalty of perjury the foregoing is true & correct.

Signature – Complainant

6 - 18 - 17
Date:

2



*U.S. Department of State*
*Office of Civil Rights*
*Washington, DC  20520*

Murad Qayyum
68 Longfield Drive
Hillsborough, NJ 08844

**RE:  EEO Case No. DOS-0025-17**

Dear Mr. Qayyum:

Enclosed is the Department of State's Final Agency Decision (Decision) for the above-referenced complaint of employment discrimination.

**STATEMENT OF APPEAL RIGHTS**

If you do not agree with the findings of the Decision and wish to pursue your claim, you may exercise one of the following options:

<u>Option 1: Appeal this Decision to the Equal Employment Opportunity Commission's Office of Federal Operations.</u>

Within thirty (30) calendar days of receipt, you have the right to appeal this Decision to the Office of Federal Operations pursuant to 29 C.F.R. 1614.402(a).  **If you do not file an appeal within the prescribed time limits, the appeal will be untimely and shall be dismissed by the Commission.**

The appeal of this Decision must be filed with the following:

> Director, Office of Federal Operations
> Equal Employment Opportunity Commission
> P.O. Box 77960
> Washington, D.C. 20013

The appeal may be submitted by one of the following means:

- Hand deliver to:

  Director, Office of Federal Operations
  Equal Employment Opportunity Commission
  One NOMA Station
  131 M Street, NE
  Suite 5SW12G
  Washington, D.C. 20507

- Transmit by Facsimile:

  Director, Office of Federal Operations
  Equal Employment Opportunity Commission
  (202) 663-7022

A *copy* of the appeal must also be submitted by email or facsimile to this Office at the same time the appeal is filed with the Commission.

- Transmit By E-mail:

  **SOCRComplaintChannel@state.gov**

  ATTN: Gregory B. Smith
  Director, Office of Civil Rights and
  Chief Diversity Officer
  U.S. Department of State
  Suite 7428
  Washington, D.C. 20520

- Transmit by Facsimile:

  Director, Office of Civil Rights and Chief
  Diversity Officer
  (202) 647-4969

If you choose to appeal, you should use the EEOC Form 573, Notice of Appeal /Petition (copy enclosed) and should indicate what you are appealing.

Any comments or brief in support of the appeal must be submitted to the Director, Office of Federal Operations, and to the agency within 30 days of filing

the appeal. Following receipt of the appeal and any comments or brief in support of the appeal, the Director, Office of Federal Operations, will request the complaint file from the agency. The agency must submit the complaint file and any agency comments or brief in opposition to the appeal to the Director, Office of Federal Operations, within 30 days of receipt of the Commission's request for the Complaint file. A copy of the agency's comments or brief will be served on the Complainant at the same time.

Any appeal must name as party defendant, in his official capacity, Rex W. Tillerson, Secretary of State. **Failure to provide the Department with timely notice of an appeal request may result in having your appeal dismissed before the EEOC.**

Option 2: File a civil action with a United States District Court with jurisdiction over your discrimination complaint.

In accordance with 29 C.F.R. § 1614.407(a), you may elect to file a civil action in an appropriate United States District Court if an appeal has not been filed with the Commission. If you choose to file a civil action, you must name Rex W. Tillerson, Secretary of State, as the proper defendant. Additionally, you must serve the Department of State with appropriate notice that you are initiating a case in federal district court.

A complainant who has filed an individual complaint, an agent who has filed a class complaint or a claimant who has filed a claim for individual relief pursuant to a class complaint is authorized under Title VII of the Civil Rights Act of 1964, *as amended*, to file a civil action in an appropriate United States District Court:

(a)   Within 90 days of receipt of the final decision on an individual or class complaint if no appeal has been filed;

(b)   After 180 days from the date of filing an individual or class complaint if an appeal has not been filed and a final decision has not been issued;

(c)   Within 90 days of receipt of the Commission's final decision on an appeal; or

(d)   After 180 days from the date of filing an appeal with the
Commission if there has been no final decision by the
Commission.

The filing of a civil action will terminate further administrative processing of
the complaint.  If you file a private suit subsequent to filing an appeal, you must
notify the EEOC in writing.

Instructions for ensuring proper service of the U.S. Department of State with
a summons or complaint are published at 22 C.F.R. § 172.2 and are repeated here
for your convenience:

Only the Executive Office of the Office of the Legal Adviser
(L/EX) is authorized to receive and accept summonses or
complaints sought to be served upon the Department or
Department employees.  All such documents should be delivered
or addressed to –

U.S. Department of State
The Executive Office
Office of the Legal Adviser, SA-17
600 19th Street, NW, Suite 5.600
Washington, DC  20522

Attention:   Alicia Frechette
Executive Director

**Failure to conduct proper service on the Department of State as
described above may result in having your case dismissed based on
procedural error.**

If you have further questions or concerns, please feel free to contact me at
202-647-9295 or via email BuddGC@state.gov.

Sincerely,

Glenn C. Budd
Chief, Intake and Resolution Section

iv

Enclosures:

1. Final Agency Decision
2. EEOC Form No. 573

## UNITED STATES OF AMERICA
## BEFORE THE UNITED STATES DEPARTMENT OF STATE

| | | |
|---|---|---|
| Murad Qayyum, | ) | |
|     Complainant, | ) | |
| | ) | |
|       v. | ) | EEO Case No. DOS-0025-17 |
| | ) | |
| Rex W. Tillerson, | ) | |
|     Secretary, | ) | |
| U.S. Department of State, | ) | |
|     Agency. | ) | |
| | ) | |

## FINAL AGENCY DECISION

### Statement of the Claim[1]

Because of Complainant's race (unspecified),[2] national origin (American-Pakistani), religion (Muslim), and as acts of reprisal for prior protected activity and opposing discriminatory policies and practices,[3] he was discriminated against when:

1. On September 7, 2016, he was removed from his position as a third-party contractor with SRC; and

2. As recently as September 7, 2016, he was subjected to a hostile work environment, characterized by, but not limited to inappropriate comments, humiliation, and false accusations.

### Procedural History

---

[1] In his rebuttal testimony Complainant ~~raised the contention~~ that his claim of reprisal had been left from the Accepted Claims. (FAD Request and Rebuttal, pp. 3-4) Consequently, this FAD will analyze Complainant's claim under a claim for reprisal as well.

[2] In his Affidavit, Complainant identified his race as "Asian-Pakistani". (Affidavit [Aff.] A, p. 5). Therefore, Complainant's race will be analyzed in this FAD as identified by Complainant.

[3] In his Affidavit and the Investigation, Complainant provided testimony that he was retaliated against due to his desire to report corrupt practices within the Bureau of Overseas Buildings Operations to the Office of Inspector General. (Aff. A, p. 7) Therefore, this purview will be analyzed in this FAD as investigated.

Complainant contacted an EEO Counselor on October 7, 2016. (Counselor's Report, page [p.] 1) Complainant's claim was not resolved through the counseling process and the EEO Counselor issued a "Notice of Right to File" on January 17, 2017. On January 19, 2017, Complainant filed a formal complaint of discrimination. (Notice of Right to File, p. 1; Formal Complaint, p. 2) The Department's letter, dated February 28, 2017, accepted the complaint for processing pursuant to 29 C.F.R. Section 1614.103, *et seq*. (Claims to be Investigated, p. 1) On March 17, 2017, the accepted claim was amended, as specified in the "Statement of the Claim," above. The Report of Investigation and notice of rights were sent to Complainant on June 7, 2017. On June 18, 2017, Complainant requested a final agency decision on the merits of the complaint. Thus, this decision is being issued pursuant to Complainant's request.

## Procedural Dismissal

As an initial matter, it should be noted that Complainant's claim for reprisal based on his having scheduled a meeting with the DOS Office of Inspector General (OIG) is subject to dismissal for failure to state claim in accordance with EEOC Regulation 29 C.F.R. §1614.107(a)(1). The Commission describes an aggrieved employee as one who suffered a present harm or loss with respect to a term, condition or privilege of employment for which there is a remedy. *See* Diaz v. Department of the Air Force, EEOC Request No. 05931049 (April 22, 1994). To state a claim under Commission regulations, an employee must allege and show an injury in fact. Specifically, an employee must allege and show "direct, personal deprivation at the hands of the employer"; that is, a present and unresolved harm or loss affecting a term, condition or privilege of his or her employment. *See* Hobson v. Department of the Navy, EEOC Request No. 05891133 (March 2, 1990).

Complainant's claim for reprisal based on his having requested a meeting with the Office of Inspector General (OIG) in May of 2016, and that meeting not coming to fruition, fails to state a claim. (Aff. A, p. 8) This claim references no present harm to a term, condition or privilege of employment. *See* Klauzinski v. Department of Veterans Affairs, EEOC Appeal No. 01A43375 (October 18, 2004), request to reconsider denied, EEOC Request No. 05A50346 (January 13, 2005) (complaint that complainant was subjected to disability discrimination when she was not allowed discovery or additional witnesses by a Merit Systems Protection Board (MSPB) Administrative Judge (AJ) is a collateral attack on another proceeding and not actionable before the Commission); Phillips v. Department of Veterans Affairs, EEOC Appeal No. 01A44853 (November 1, 2004), request to reconsider denied, EEOC

2

Request No. 05A50282 (January 6, 2005) (allegation of unfair reassignment fails to state a claim because no protected basis of discrimination was raised during EEO counseling, in the formal complaint, or even on appeal).

Accordingly, pursuant to 29 C.F.R. §1614.107(a)(1), this claim is dismissed for failure to state a claim.   Assuming, but only for the sake of argument, that Complainant is an aggrieved employee, the merit of Complainant's claim will be examined below.

### Statement of the Facts

At all times relevant to the matters raised in the accepted claim, Complainant was employed as a Civil Engineer (third-party contractor), Scientific Research Corporation (SRC), Bureau of Overseas Buildings Operations (BOB), U.S. Consulate Karachi, Karachi, Pakistan. (Aff. A, pp. 2, 3)  Complainant's first level supervisor at DOS during the period of the alleged discrimination was Steve Brda, Project Director, FS-1/16; and his immediate supervisor at SRC was Stacey Price, Program Manager. (Aff. A, pp. 2, 3, 4; Aff. B, pp. 1, 3; Aff. D, pp. 1, 3)  Complainant claims to have suffered discrimination at the hands of Mr. Brda, Ms. Price and Stephen Foster, Construction Manager, FS-03. (Aff. A, p. 5; Aff. C, p. 1)

**Protected Classes**

*Race and National Origin*

*Complainant's Contentions*

Complainant identified his race as "Asian-Pakistani" and his national origin as "Pakistani".  He testified that Mr. Brda was aware of his race and national origin as in May of 2015, Mr. Brda inquired about his "origin" and he informed Mr. Brda that he was from Pakistan.  Complainant maintained that after he informed Mr. Brda of his birthplace in Pakistan, Mr. Brda informed him that he was hiring him because he was "Pakistani-American".  He attested that again on October 2, 2015, Mr. Brda pointed at him and told him that "'the only reason you are [is] because of your Pakistani origin.'"  (Aff. A, pp.5-6, 7)

*Management's Response*

Mr. Brda identified his race as "Caucasian" and his national origin as "American". He asserted that he became aware of Complainant's race and national origin, Asian

and Pakistani/American, in April of 2015, during the hiring process. (Aff. B, pp. 1, 2)

Mr. Foster identified his race as "European-American descent with some Native American" and his national origin as "American." He asserted that he was aware that Complainant was Asian and his national origin was Pakistani/American. Mr. Foster opined he learned of Complainant's race on September 29, 2015. He explained that he learned of Complainant's race and nationality prior to his arrival. (Aff. C, pp. 1, 2)

Nadia Suzette Riley, Program Analyst, GS-13, identified her race as "Black" and her national origin as "Jamaican". She asserted that she was not aware of Complainant's race and/or national origin. (Aff. E, pp. 1-2)

*Additional Witnesses*

Ms. Price identified her race as "White" and her national origin as "USA". She advised that she was aware that Complainant was a Pakistani-American. Ms. Price explained that during the new hire process for the SRC, Complainant told her that he would be a perfect fit for a position in Karachi since he was born in Pakistan. She also asserted that SRC used Complainant's passport for deployment processing and his passport identified his place of birth. (Aff. D, p. 2)

**Religion**

*Complainant's Contentions*

Complainant identified his religion as "Islam-Muslim". He advised that Mr. Brda and Mr. Foster were aware of his religion as during a normal "friendly meeting in the office, [they] discussed and talked about DOS/OBO project, politics & religion." Complainant averred that they all knew about one another's religion. (Aff. A, p. 6)

*Management's Response*

Mr. Brda identified his religion as "Buddhist". He advised that he did not know Complainant's religion, as he never asked and Complainant never offered. (Aff. B, p. 2)

4

Mr. Foster identified his religion as "Church of Jesus Christ of Latter-Day Saints." He maintained that he did not know Complainant's religion nor had they ever discussed his religion. (Aff. C, p. 2)

Ms. Riley identified her religion as "Non-Denominational". She maintained that she was not aware of Complainant's religion. (Aff. E, p. 2)

*Additional Witnesses*

Ms. Price identified her religion as "Christian". She denied any knowledge of Complainant's religion as the subject was never discussed. (Aff. D, p. 2)

***Reprisal***

*Complainant's Contentions*

Complainant testified that his protected activity consisted of his contact with the Office of Inspector General (OIG). He explained that he reported about corrupt practices, including waste of U.S. tax dollars, bribery by his employer, SRC, to obtain visa for SRC employee, Electrical Contractor, Jim Benson. (Aff. A, pp. 7, 15)

Documentary evidence includes an email dated May 10, 2016 from "Islamabad Announcements" to "All Personnel, All Agencies – Mission Pakistan". The email indicated that the OIG was in the process of inspecting Mission Pakistan, including the U.S. Embassy in Islamabad and the Consulates General in Peshawar, Lahore and Karachi. It noted that the inspections would last until June 21, 2016. (Aff. A, p. 37; Aff. C, p. 25; Aff. D, p. 21)

A week later, record evidence revealed an email dated May 17, 2016 from Complainant to OIG, Islamabad. Complainant noted that he was requesting to schedule a short interview with the OIG team in Karachi. The email stream showed that Mira Piplani, OIG Inspector, replied to Complainant and informed him that she would meet with him when they visited Karachi. (Aff. A, p. 38; Aff. C, p. 26; Aff. D, p. 22)

Complainant maintained that Mr. Brda and Mr. Foster were fully aware that he had scheduled meetings with the DOS-OIG and that Mr. Foster attempted to inquire about the activities that were on the meeting agenda. He advised that when the OIG Inspector arrived at the Consulate and met with Mr. Foster, he was waiting to be

called for their meeting but the OIG Inspector left the office without meeting with him and never responded to any subsequent emails. (Aff. A, p. 8)

In addition, Complainant explained that in July of 2016, Mr. Brda was "very angry with [him]" and had stopped communicating with him directly after he had pointed out "some serious contractual ambiguities in the construction of INOX building especially the welding of painted structural steel, ventilation was very poor and the workers inside the building start getting sick. The contractor had to stop the work for about 2-weeks [sic]." He advised that Mr. Brda was "very upset" about the situation and in the last week of August 2016, Mr. Brda was not answering his phone calls and never returned the calls. Complainant also asserted that one-day Mr. Foster took him to lunch for a counseling and put pressure on him that he should stop pointing out errors in the construction contract and contractor's work, as well as to refrain from making negative comments in the meetings. He maintained that Mr. Foster told him that they should make Mr. Brda look good in front of others. Complainant advised that he responded to Mr. Foster by informing him that he disagreed with the premise and he felt that Mr. Brda was communicating with him through Mr. Foster as everyone was aware of the tense situation between he and Mr. Brda. (Aff. A, pp. 8, 11)

Thereafter, Complainant attested that on September 4, 2016 he met with an EEO Counselor at the Consulate in Karachi and briefed her about his on-going issues. He asserted that she acknowledged that his issues appeared serious and she referred him to an EEO Representative at the U.S. Embassy, Islamabad, Pakistan. Complainant averred that three days later, on September 7, 2016, without any notice, he was removed from the Consulate in Karachi. (Aff. A, p. 8)

He opined that Mr. Brda, Mr. Foster and Ms. Price were all aware of the aforementioned activity. (Aff. A, pp. 8-9)

As to his voicing opposition to discrimination, Complainant maintained that Mr. Foster had instructed him that he was not allowed to attend town hall meetings and other meetings with management officials. He asserted that he told Mr. Foster that he was discriminating against him to which Mr. Foster replied that he was a third-party contractor and he did not fall under the jurisdiction of Chief of Mission. Complainant attested that his contract stated that he was under the jurisdiction of the Chief of Mission and after this exchange Mr. Foster appeared upset and walked away. He maintained that Mr. Brda and Mr. Foster were aware that he was resisting corrupt practices, irregularities in the construction contracts and he was committed to reporting such things to OIG and EEO. (Aff. A, pp. 9, 11)

6

*Management's Response*

Mr. Brda testified that he had no knowledge that Complainant had arranged a May 17, 2016 meeting with the OIG and was subsequently prevented from appearing at the meeting. Mr. Brda explained that he was sure that the OIG was not in Karachi on May 17, 2016. He maintained that the OIG did visit Karachi in late May/early June of 2016. Mr. Brda averred that he did not hear nor did Complainant ever tell him that he had requested a meeting with the OIG. He advised that he was not aware of Complainant having voiced any opposition to discrimination. (Aff. B, pp. 2-3)

Mr. Foster attested that he was not aware of any meeting that Complainant had scheduled with the OIG Inspectors or that anyone had denied him the opportunity to meet with them. He advised that he was aware that Complainant had concerns and he instructed Complainant on his rights and that he had a responsibility to report matters that he believed were contrary to U.S. laws and policies. Mr. Foster averred that Complainant could not have met with the OIG Inspectors on May 17, 2016 as the team did not arrive in Karachi until May 29, 2016 due to security issues. He asserted that the team was also reduced in the number of members attending. (Aff. C, p. 2)

Mr. Foster further testified that he was not aware of Complainant voicing opposition to any form of discrimination. He advised that he was fully aware of Complainant voicing opposition to American third-party contractors not being considered as Chief of Mission, although Complainant insisted that it was clearly defined in the contract between DOS and SRC. He asserted that he arranged a meeting at Complainant's request to discuss this issue with DOS management. (Aff. C, p. 3)

Ms. Riley denied any knowledge of Complainant's participation in protected activity. She expressed that on September 9, 2016 she was copied on an email from SRC with an attachment titled "'SERIES OF EVENTS' where Complainant claimed that he was experiencing humiliating and discriminatory behavior." (Aff. E, pp. 3-4)

*Additional Witnesses*

Ms. Price asserted that she was not aware of nor involved in this matter. She explained that on September 3, 2016, Complainant sent her a list of events that mentioned that he had arranged to meet with the OIG on May 17, 2016 and was not

7

allowed to attend the meeting. Ms. Price maintained that she did not know what occurred. She expressed that Complainant alerted her of the events through email. (Aff. D, pp. 2-3)

Record evidence contains a Memorandum dated September 3, 2016 from Complainant regarding "**SERIES OF EVENTS**". The Memorandum details several events beginning on October 2, 2015 through September 3, 2016. It details Complainant's issues with construction projects as well as his denied May 17, 2016 meeting with the OIG. (Aff. C, pp. 22-23; Aff. D, pp. 18-19; Aff. E, pp. 8-9)

## Claim #1 – Complainant was removed from his position as a third-party contractor with SRC

*Complainant's Contentions*

Complainant testified that in his role as a Civil Engineer he was responsible for "review design, Request for Information, submittals, shop drawings, inspection, review contractor's change request, prepare estimates for change orders, review construction schedule, review contractor's monthly payment request, Attend weekly and emergency meetings [sic]." He admitted that he was not a federal government employee but was instead an employee of SRC. Complainant advised that he had an employment contract with SRC and Ms. Price was his immediate supervisor at SRC. He expressed that he was employed by SRC to perform work at various locations on DOS/OBO projects worldwide dealing with on-site construction management. (Aff. A, pp. 2, 3-4)

Contained in the record evidence is correspondence dated June 22, 2015 from SRC to Complainant. According to the letter, Complainant was offered and accepted a job as a Planning & Control Analyst with SRC. It noted that Complainant would "work primarily at the U.S. Government site in Karachi, Pakistan...[and] [he] will report directly to [Ms.] Price..." The correspondence further noted that the duration of the assignment would be eighteen months and that he would be "subject to the direction and control of the Chief of Mission and his designee(s)...The Chief of Mission will have complete discretion regarding employment activities during the term of deployment to include removal from post if it is determined to be in the best interest of the United States Government." It was also specified that "[t]his contingent offer of employee does not constitute a contract of employment and nothing herein is intended to imply any period of guaranteed employment. All employment with SRC in on an at will basis." (Aff. A, pp. 32-35)

8

Complainant averred that he arrived in Karachi, Pakistan on September 29, 2015 to perform his duties as a Civil Engineer.  He asserted that Mr. Brda was his DOS supervisor.   Complainant maintained that he was not aware of who was his Contracting Officer Representative (COR).  (Aff. A, pp. 2, 3-5)

Complainant attested that Mr. Brda and Mr. Foster were the DOS management officials who made the decision to terminate him.  He advised that Ms. Price, his SRC supervisor, was also involved in the termination decision.   Complainant explained that Mr. Brda contacted Ms. Price and decided to remove him from Karachi, Pakistan.  He advised that on September 3, 2016 he sent an email to Ms. Price detailing his concerns with Mr. Brda and Mr. Foster.  Complainant asserted that on the same date, September 3, 2016, Ms. Price spoke with and informed him that Mr. Brda was not very pleased with him because he was not performing well and that Mr. Brda had decided to remove him from the site.  Complainant averred that Ms. Price later attempted to twist the story and stated that Mr. Brda had evaluated the project after a year and had reached the conclusion that the Civil Engineer position was no longer needed and thus, Complainant would be removed from the site.  He opined that he replied by telling Ms. Price that the construction still had "about 50% Civil Work left to finish."  (Aff. A, pp. 9-10, 11-12)

Included in the record evidence is an email dated September 3, 2016 from Complainant to Ms. Price, referencing Mr. Brda's questions regarding the "'Concrete Pre-Pour Inspection Check List.'"  The email stream revealed that Complainant had attached an August 21, 2016 email from Mr. Brda which detailed some issues with "Rebar Inspections."  Complainant complained in the September 3, 2016 email that he disagreed with Mr. Brda's assessment and he warned Ms. Price that Mr. Brda was using the check list against him to exhibit poor performance. Complainant stated that Mr. Brda had a right to request a replacement but he did not have the right to create a hostile working environment. (Aff. A, pp. 39-40, 41; Aff. C, pp. 16-21; Aff. D, pp. 12-17)

Three days later, on September 6, 2016, the record evidence revealed an email from Mr. Brda to Ms. Price.  Mr. Brda informed Ms. Price that they were approaching the one-year anniversary of Complainant's start date and that in recent months, "[Complainant] has become more of a hindrance to the project than a help and we think it's best to terminate his contract after he completes his first year. [Complainant] is failing to contribute in any significant way in his core competency—Civil Engineering—and has diverted his attention in unwanted directions such as Roofing, Elevators, Generators, Fire, Architectural finish, Security, etc.  I believe [Complainant] is also interested in departing as his mood has

turned very negative and we have noticed him searching for a new job on his Open Net computer while at work." The email concluded with Mr. Brda requesting that Ms. Price follow-up with him if needed and noted that Mr. Benson and Mechanical Contractor, Nisar Alvi were doing well and they were very happy with their performances. (Aff. C, p. 15; Aff. D, p. 11)

That same day, on September 6, 2016, Ms. Price replied to Complainant's September 3, 2016 email and informed Complainant that she had received an email from Mr. Brda noting that later that month, he (Complainant) would have completed one year and that Mr. Brda had evaluated the situation regarding Civil Engineering and his services were no longer needed. Ms. Price specifically stated that "[t]he [DOS] contract states that these are one-year contracts, and it is up to the discretion of the USG to decide if services are needed." The email stream showed that Complainant replied and only informed Ms. Price that he would prefer leaving the Post on September 15, 2016. (Aff. A, p. 41; Aff. C, p.16; Aff. D, p. 12)

Complainant maintained that SRC removed him as a third-party contractor on September 15, 2016. He attested that three days later, on September 18, 2016, he returned to the United States. (Aff. A, p. 10)

*Management's Response*

Mr. Brda testified that he first met Complainant on September 30, 2015. He maintained that he was the Project Director for the project that Complainant was assigned to. Mr. Brda asserted that Ms. Riley informed him that he was the COR designee for Complainant and that he had supervisory authority over Complainant in conjunction with Ms. Price. He explained that he provided Complainant with the overall direction in the office and Mr. Foster provided Complainant with routine work assignments. Mr. Brda advised that Complainant's duties were "Civil Engineering/Structural Engineering oversight". (Aff. B, pp. 3-4, 5, 22, 23)

Mr. Brda averred that he had concerns with Complainant's job performance. He attested that Complainant missed some key deficiencies in his review of shop drawings and he failed to take part in field inspections at key moments. In addition, Mr. Brda asserted that in the final months of his tenure under his contract, Complainant was failing to contribute his core competency as a Civil Engineer. He explained that Complainant had diverted his attention towards matters involving roofing, elevators, generators, fire protection, architectural finish and security. Mr. Brda further explained that Complainant was openly searching for a new job on his

10

OpeNet computer and was discussing with project personnel of his intentions to depart the project. (Aff. B, pp. 5, 23)

Mr. Brda maintained that he raised these concerns with Complainant during one-on-one discussions. He expressed that this type of dialogue was common to how he approached his other staff members. Mr. Brda testified that Mr. Foster also held similar concerns about Complainant's performance. He asserted that Mr. Foster also had discussions with Complainant to address performance concerns. (Aff. B, pp. 5-6)

Mr. Brda attested that Complainant was contracted to work for the DOS for one year, from September 30, 2015 through September 29, 2016. He maintained that he was the management official who contacted SRC to inform them that Complainant's services were no longer needed. Mr. Brda advised that on September 6, 2016 he sent an email to Ms. Price recommending that Complainant contract not be extended into a second year. He attested that the September 7, 2016 email regarding "Rebar Inspections" included a discussion about Complainant's upcoming departure from Karachi. Mr. Brda expressed that Ms. Price told Complainant that his last day of work would be on September 8, 2016 and that his U.S. Government issued phone and consular badge would be collected on that date. He denied that any other officials were involved in the termination decision. (Aff. B, pp. 6-7)

Mr. Brda demurred that Complainant was terminated based on the performance deficiencies discussed above. He maintained that he did not believe that it was beneficial to the project or the U.S. Government to extend Complainant's contract beyond the base year of the contract. (Aff. B, p. 7) Mr. Brda testified that Complainant did not ask him why he was being removed. He attested that the decision not to extend Complainant's contract was covered in an email between SRC and Complainant. (Aff. B, p, 8)

Mr. Brda maintained that Complainant's removal from the contract coincided with the end date of his contract. He explained that Complainant's last day of work on-site was September 8, 2016, but he could remain on-call until his departure date, which was later that month. Mr. Brda advised that this gave Complainant time to collect and close-out his personal affairs. He attested that this course of action as to departure was agreed upon by Ms. Price, Mr. Riley and Complainant. (Aff. B, pp. 7-8)

Mr. Brda denied that Complainant was ever "fired". He maintained that Section C of the Statement of Work (SOW) provided that "'The period of performance is one

11

year from the date of the deployment of each employee. The task order may be extended by up to four additional option years per employee.'" Mr. Brda asserted that the optional years were not exercised as it pertained to Complainant. (Aff. B, pp. 8, 9)

Included in the record evidence is an excerpt from the SOW. Section C.3 of the SOW provides that the "Contracting Officer will issue task orders to fill one or more positions. The period of performance is one year from the date of deployment of each employee. The task order may be extended up to four additional option years per employee." (Aff. B, p. 26).

Mr. Brda averred that Complainant's race, religion, national origin and/or prior protected activity were not factors in his decision to remove Complainant from this project. (Aff. B, pp. 8-9)

Mr. Foster testified that Complainant worked for him and Mr. Brda. He advised that Mr. Brda was the COR and was responsible for Complainant's leave, work assignments and performance evaluation. Mr. Foster asserted that he provided Complainant with guidance on a daily or weekly basis as to Complainant's tasks. He explained that Complainant was responsible for the review and inspection of all aspects of the project as it pertained to Civil Engineering during the construction phase. (Aff. C, pp. 3-4, 5)

Mr. Foster averred that he had concerns with Complainant's job performance. He explained that in the summer of 2016 he began having concerns about the decline in the quality of Complainant's submitted reviews and Complainant's reluctance to perform inspections. Mr. Foster asserted that Complainant began acting more like the Construction Manager as opposed to the lead Civil Engineer. (Aff. C, p. 4)

Mr. Foster testified that to quell these concerns he spoke with Complainant in June or July of 2016. He attested that they discussed the parameters of Complainant's position as lead Civil Engineer on the project. Mr. Foster maintained that he informed Complainant that his duties consisted mainly of submittal review and inspection of work as it related to civil engineering. He also expressed that Complainant's duties included coordination with electrical and mechanical engineering, as well as immediate action if there was a safety violation that could lead to harm to personnel and/or property. Mr. Foster advised that Complainant appeared to understand the outline of his duties and indicated that he was happy to have less responsibilities. (Aff. C, p. 5)

Mr. Foster averred that following the discussion, Complainant became less engaged in his work and withdrew from the office. He advised that in early August of 2016 he again met with Complainant for lunch to discuss Complainant's quality of work, as it was suffering. Mr. Foster explained that he knew Complainant was having difficulties with his family at home and was looking for a new job instead of performing his duties on the project. He asserted that he had witnessed Complainant searching the internet for jobs as had the contractor's Quality Control Manager. Mr. Foster attested that the Quality Control Manager thought that Complainant's job search was inappropriate and had informed him of what he had witnessed. (Aff. C, p. 5)

Mr. Foster demurred that during the lunch meeting, Complainant mentioned that he felt that Mr. Brda had made comments that he felt were unprofessional, but he did not provide any details. He advised that Complainant informed him that he did not have issues with him and felt that he was professional. Mr. Foster maintained that Complainant did not have much to say about his performance issues. He averred that he got the feeling that Complainant was ready to leave Karachi. (Aff. C, p. 5)

Mr. Foster opined that he and Mr. Brda held discussions on Complainant's job performance. He advised that based on their conversations he understood that Mr. Brda held the same concerns as he did with respect to Complainant's performance. Mr. Foster testified that he was aware that they did not exercise the option on Complainant's contract with SRC. He denied that Complainant was removed from his position, but instead did not have the option to extend his contract exercised. Mr. Foster maintained that Complainant's departure was prior to the completion of the construction project's contract. (Aff. C, pp. 5, 6)

Mr. Foster explained that Complainant was contracted to begin work on or about September 2015 under a one-year contract with options to extend that contract. He denied that he was the management official who contacted SRC to inform them that Complainant's services would no longer be needed. Mr. Foster averred that the only management official involved was Mr. Brda, who was the COR. He denied that he had any authority to contact SRC or tell them that he wanted Complainant fired. (Aff. C, pp. 6-7)

Mr. Foster averred that Complainant did not ask him why his option was not exercised. He advised that he did not have any contact with Complainant since his departure from Karachi. (Aff. C, p. 7)

13

Mr. Foster attested that Complainant's race, religion and/or national origin were not factors in the decision not to exercise the option on Complainant's contract. He asserted as to Complainant's prior protected activity being a factor, that to his knowledge, Complainant was never stopped from contacting the OIG on May 17, 2016 as Complainant had alleged. Mr. Foster denied ever being told by Complainant that he had made an appointment with the OIG or was trying to make an appointment with the OIG. He advised that he recalled Complainant raising concerns of waste and bribery, and in response, he told Complainant that he should contact the OIG, or the Fraud, Waste, and Abuse Hotline. Mr. Foster maintained that if Complainant had made any such report, Complainant would have been contacted directly. (Aff. C, p. 8)

Ms. Riley averred that she served as the COR of an "Indefinite Delivery Indefinite Quantities Contract" that SRC was a participant to. She maintained that she did not know Complainant, but she was aware that he was provided a Civil Engineering position per the SRC contract. Ms. Riley asserted that she had no role in supervising Complainant. She explained that Mr. Brda was the COR for the task order related to Complainant. (Aff. E, pp. 4, 5)

Ms. Riley testified that third-party contractors, like Complainant, were not employed by the DOS. She explained that the hiring and/or termination process was handled by the contractor (in Complainant's case, SRC). Ms. Riley further explained that the DOS solicited for services from the nine participating firms in the "Indefinite Delivery Indefinite Quantities Contract" and once resumes were reviewed by the Project Director and a firm selected, the COR notified the winning firm of the selected candidates. (Aff. E, pp. 6, 7)

Ms. Riley opined that any termination process of a third-party contractor would be handled by the Firm Contractor and not the DOS. She maintained that the period of performance on any task order would be one year from the date of deployment of a third-party contractor, which could be extended up to four additional one-year options. Ms. Riley asserted however, that if the services were no longer needed during or at the end of the first year, the contractor would be notified in writing. She went on to assert that when there were conduct and/or performance issues with a third-party contractor/employee the contractor would be contacted and would be given an opportunity to mitigate the problem or problems. Ms. Riley advised that failure to mitigate the problems could be grounds for removal of the employee in question. (Aff. E, p. 7)

*Additional Witnesses*

14

Ms. Price testified that she was Complainant's SRC supervisor and that Complainant was an employee of SRC who was assigned to work on SRC's contract with the DOS. She expressed that Mr. Brda was responsible for granting leave, assigning work, and evaluating Complainant's performance while he worked in Pakistan as he was the COR. Ms. Price explained that once SRC received the official Government funding for the position, Mr. Brda was assigned as the COR. (Aff. D, pp. 3, 4, 5-6)

Ms. Price averred that after Complainant's deployment to Karachi, she communicated with him through email, two to three times a month regarding his SRC timesheets, expense reporting, and personal vacation travel. She maintained that Complainant was an SRC employee and that SRC granted Complainant's leave. (Aff. D, p. 3)

Ms. Price attested that Complainant was assigned as the Civil Engineer for the DOS project at Karachi, Pakistan. She asserted that the project included on-site work, utilities, minor renovations and expansion to other buildings. Ms. Price advised that Complainant was to provide a range of critical engineering and constructions quality assurance and management and technical oversight of the project. She averred that "[Complainant] was responsible for performing technical inspections of civil and structural work, monitoring the contractor's quality control program, and reviewing project drawings and specifications to ensure compliance." Ms. Price maintained that Complainant was to support and assist in ensuring that the project was completed within U.S. codes and standards. She opined that he was to ensure that the general contractor was performing the required contract work in accordance with contract documents. Ms. Price expressed that Complainant reviewed engineering drawings and determined if the contractor complied with the final design parameters. (Aff. D, pp. 4-5)

Ms. Price advised that she did not have any concerns with Complainant's job performance. She asserted that no one at DOS expressed any concerns with Complainant's performance. (Aff. D, p. 5)

Ms. Price explained that all SRC employees were at-will employees. She expressed that Complainant did not have an employment contract with SRC or with DOS. Ms. Price maintained that when Complainant was hired he was told how long the DOS assignment was expected to last, but he was also told that the DOS could instruct SRC to remove an SRC employee from a DOS project at any time. She advised that Complainant was told that the Karachi project was expected to last eighteen months.

15

Ms. Price also advised that all SRC's employees on the DOS contract were evaluated every twelve months. (Aff. D, pp. 7, 8)

Ms. Price maintained that Complainant completed twelve months on the DOS project in Karachi. She asserted that Mr. Brda informed her that the Civil Engineer position was no longer needed. Ms. Price expressed that Complainant's offer letter stated that the DOS Chief of Mission would have complete discretion regarding employment activities during the term of his employment, including removal from Post it was determined to be in the best interest of the U.S. Government. She explained that Complainant contract terminated on the earlier of the termination dates in the contract. (Aff. D, pp. 7-8)

Ms. Price averred that the DOS did not specifically inform her that Complainant should be "'fired'". She again asserted that Mr. Brda stated that the project no longer needed a Civil Engineer. As to Complainant's employment with SRC, Ms. Price testified that he was terminated under the SRC contract on September 30, 2016 due to a lack of funding for the position. She explained that such a termination or layoff was common when the U.S. Government instructs SRC that a position was no longer needed. Ms. Price advised that SRC did not support Civil Engineering work on any projects other than the DOS/OBO program. She attested that SRC had numerous other Civil Engineering openings on other DOS/OBO projects since Complainant's SRC termination but Complainant did not apply. (Aff. D, p. 9)

Ms. Price testified that she had no knowledge that Complainant's race, religion and/or national origin were factors in the DOS's decision to eliminate Complainant's Civil Engineering position. She expressed that SRC had another Pakistani employee assigned to the Karachi project. (Aff. D, pp. 9-10)

Ms. Price demurred that Complainant's prior protected activity was not a factor as she was not aware of any such activity. She explained that on September 3, 2016, Complainant informed her of some protected activity in May of 2016, (involving Complainant's requested meeting with the OIG); however, she was not made aware of that action until the September 3, 2016 email. (Aff. D, pp. 10, 18))

## Claim #2 – Complainant was subjected to a hostile work environment, characterized by, but not limited to inappropriate comments, humiliation, and false accusations

*Complainant's Contentions*

16

*October 2, 2015 Comment*

Complainant testified that on October 2, 2015, Mr. Brda made a comment about Complainant's Pakistani origin during a discussion about the project. He asserted that this comment precipitated by his disagreement with Mr. Brda on certain issues and Mr. Brda had become upset, angry and lost control. Complainant expressed that Mr. Brda pointed at him and stated "'[t]he only reason you are here because of your Pakistani Origin' in the presence of other locals and SRC employee [Mr.] Alvi.'" He explained that this violated the EEO laws. (Aff. A, pp. 15, 18)

*October 15, 2015 Comment*

Complainant attested that on October 15, 2015 at about 10:00 a.m., Mr. Brda invited him to join him for the inspection of the construction field office. He averred that during their inspection he stated that the office was too big as compared to the value of the total project cost and that the quality of workmanship, construction and material was "very poor and was not built as per DOS/OBO construction policies and standards." Complainant maintained that Mr. Brda "raised his voice" and queried how he was aware of the information. He testified that he responded by telling Mr. Brda that he was older, more experienced and had seen more construction projects than he had. (Aff. A, p. 19)

Complainant averred that after the discussion with Mr. Brda he (Complainant) met with Mr. Alvi and told him that Mr. Brda was shouting at him. He asserted that Mr. Alvi "just laughed and stated good luck and we have to live with it." (Aff. A, pp. 19, 20)

*November 2015, Accused of Falsifying Hours*

Complainant opined that Mr. Brda, in November of 2015, accused him of falsifying his hours. He explained that although Mr. Brda approved his time cards, Mr. Brda stated that he could not verify that he was working that many hours. Complainant testified that Mr. Brda then contacted on-site contractors and queried them about his work hours. He advised that Hakan Arnas, Project Manager, informed him that Mr. Brda believed that he (Complainant) was tampering with the hours and claiming more hours than worked. Complainant asserted that he replied to Mr. Brda's inquiry by telling him that he was only five minutes away from the work location and that Mr. Brda should simply come out to the site and verify if he was working the hours claimed. (Aff. A, p. 20)

17

Complainant attested that he was coming and leaving the work location with contractor's management personnel. He maintained that it would have been easy for Mr. Brda to verify his hours. Complainant advised that Mr. Brda accused him of this instead of checking because he "hated" him. (Aff. A, p. 21)

Complainant maintained that there were seven hours that he still has not been paid. He explained that due to security reasons, there was a procedure that allowed a contractor to work overtime. Complainant advised that Mr. Brda did not question contractor's hours but accused him of same without evidence. (Aff. A, p. 20)

*November 2015, Town Hall Meeting*

Complainant testified that Mr. Foster informed him in November of 2015 that he was not allowed to attend a Town Hall Meeting with the Ambassador. He asserted that Mr. Foster informed him that because he was a contract employee he did not fall under the jurisdiction of the Chief of Mission, and thus, he was excluded from all meetings with Consulate Management Officials. (Aff. A, pp. 21-22)

Complainant averred that all U.S. citizens working for the DOS automatically fell under the jurisdiction of the Chief of Mission, as evidenced by his contract agreement. He asserted that each U.S. citizen had the right to attend all meetings and receive all trainings. Complainant maintained that despite this position, third-party contractors did not automatically qualify for certain services, such as delivery of U.S. mail, riding in armored vehicles, medical treatment and living in apartments on the compound. He opined that third-party contractors had to pay for these services. (Aff. A, p. 22)

*May 17, 2016 OIG Meeting*

Complainant attested that on May 17, 2016, Mr. Foster prevented him from attending a meeting with the OIG. He explained that the purpose of meeting with the OIG was to report the corrupt practices in the construction contract, the bribing of contractor Epik by SRC to obtain a visa for Mr. Benson, socializing with the contractor on a regular basis and consumption of alcohol in the construction field office. He also maintained that he was going to raise conflict of interest issues as he was forced to sign the contractor's quality control construction documents, along with someone having crashed his computer. (Aff. A, pp. 22-23)

18

As discussed above in detail, record evidence revealed an email dated May 17, 2016 from Complainant to OIG wherein he had requested a meeting with the OIG when they arrived in Karachi.   The email stream revealed that the OIG received Complainant's email and indicated that they would meet with him when they arrived in Karachi. (Aff. A, p. 38; Aff. C, p. 26; Aff. D, p. 22)

Complainant advised that Mr. Foster provided him no explanation as to why he was not allowed to attend the meeting with the OIG.   He asserted that Mr. Foster indicated that he did not know anything about it. (Aff. A, p. 23)

Complainant asserted that he was not satisfied with Mr. Foster's response as it appeared to him that Mr. Foster was acting "suspicious."  He maintained that he made several attempts to contact the OIG Inspector but she did not respond to his emails.  Complainant averred that the meeting was cancelled based on a "conspiracy between OIG inspector and [Mr.] Foster." (Aff. A, p. 23)

## *August 9, 2016 Raised Voice*

Complainant opined that on August 9, 2016, Mr. Brda became "very upset" with him and stated "'Do you want to go back to United States'".  He maintained that the "threatening" comment was made in a low tone to prevent anyone else from hearing it; specifically denying that it was in a raised voice.  Complainant advised that the comment occurred inside Mr. Brda's office and when he exited he reported the comment to Mr. Alvi. (Aff. A, p. 24)

Complainant asserted that this comment was based on his October 15, 2015 comments about the "serious problems with field office structure."  He again asserted that Mr. Brda was upset about his comments on October 15, 2015. (Aff. A, p. 24)

## *September 7, 2016, Government Property Taken*

Complainant testified that Mr. Brda made the decision to take all his government property on September 7, 2016.  He asserted that on the day in question, the Security Coordinator followed he and Mr. Alvi to the security gate.  Complainant advised that the Security Coordinator pointed at him and asked him to return all U.S. Government items and informed him that he was not allowed to return to the U.S. compound.  He maintained that he and Mr. Alvi were shocked and the Security Coordinator informed them that he was only complying with Mr. Brda's instructions. (Aff. A, p. 25)

19

Complainant averred that although he was shocked, he kept calm and returned all the U.S. Government property to the Security Coordinator. He expressed that he requested proof of the items he returned, to which the coordinator responded that Mr. Brda would send a confirmation via email. Complainant maintained that he never received the confirmation email. (Aff. A, p. 26)

*Management's Response*

<u>October 2, 2015 Comment</u>

Mr. Brda averred that on October 2, 2015 he did not make an inappropriate comment about Complainant's Pakistani origin. He explained that Complainant was possibly referring to his observation that being a cleared Pakistani/American was a "'plus'" for the Karachi project. Mr. Brda asserted that this was because visa issues were greatly streamlined for Pakistani/Americans that held U.S. and Pakistani passports. He advised that clearing American passport holders could sometimes take months which created a staffing concern for all OBO projects in Pakistan. Mr. Brda maintained that being a cleared Pakistani/American, although a plus, was not the only criteria. (Aff. B, p. 11).

Mr. Brda testified that Complainant never told him that this comment constituted a hostile work environment. He asserted that as a result, no action was taken. (Aff. B, p. 12)

<u>October 15, 2015 Comment</u>

Mr. Brda averred that he did not recall any "'raised voice' episodes" involving Complainant on October 15, 2015. He asserted that anyone who worked with him or knew him, understood he could raise his voice on occasion. Mr. Brda maintained that he could raise his voice when either excited or frustrated. He advised that it could be possible that he spoke to Complainant on October 15, 2015 in a raised voice. (Aff. B, p. 12)

Mr. Brda testified that Complainant never told him that this comment constituted a hostile work environment. He asserted that as a result, no action was taken. (Aff. B, pp. 12-13)

<u>November 2015, Accused of Falsifying Hours</u>

20

Mr. Brda denied that he accused Complainant of falsifying work hours in November of 2015. He averred that this conversation never took place, although he was responsible for signing and approving all project personnel timesheets. Mr. Brda asserted that at times he would ask personnel questions regarding their timesheets to gain clarification. (Aff. B, p. 13)

Mr. Brda opined that Complainant never told him that being accused of falsifying work hours constituted a hostile work environment. He maintained that as there was no report to him, no action was taken. (Aff. B, pp. 13-14)

### *November 2015, Town Hall Meeting*

Mr. Brda attested that there was no Town Hall Meeting with the Ambassador in November of 2015. He maintained that there was such a meeting on December 21, 2015; however, to his knowledge, no management official denied Complainant opportunity to attend the Town Hall Meeting with the Ambassador. (Aff. B, p. 14)

Mr. Brda opined that Complainant never told him that not being able to attend the Town Hall Meeting with the Ambassador constituted a hostile work environment. He maintained that as there was no report to him, no action was taken. (Aff. B, pp. 14-15)

Mr. Foster testified that there was no Town Hall Meeting with the Ambassador in November of 2015. He maintained that there was a Town Hall Meeting in December of 2015, but he was not in the country at the time. Mr. Foster denied any knowledge of anyone telling Complainant that he could not attend as he believed that the meeting was open to all personnel on the compound and that Mr. Alvi attended the meeting. (Aff. C, pp. 10-11)

### *May 17, 2016 OIG Meeting*

Mr. Brda averred that he was not aware that Complainant had contacted the OIG and requested a meeting. He denied that he prevented Complainant from attending any meeting with the OIG. Mr. Brda testified that "it goes without saying that one does not need their Supervisor's permission to report suspected cases of fraud, waste, or abuse. The OIG had an online 'hotline form' as well as a 1-800 number to report suspected cases of fraud, waste, or abuse…" (Aff. B, p. 24)

21

Mr. Brda opined that Complainant never told him that not being able to attend the OIG meeting constituted a hostile work environment. He maintained that as there was no report to him, no action was taken. (Aff. B, pp. 24-25)

Mr. Foster asserted that he was not aware that Complainant had contacted the OIG and requested a meeting; nor did he prevent him from attending. He explained, as addressed above, that if Complainant had contacted the OIG and requested a meeting, the OIG would have a record of the request and why they did not meet with Complainant. Mr. Foster maintained that if Complainant had missed the meeting or was prevented from attending OIG would have a record of a follow-up. (Aff. C, pp. 11-12)

Mr. Foster testified that he did not recall Complainant ever telling him that he was prevented from attending the OIG meeting. He also testified that Complainant never indicated to him that this action constituted a hostile work environment. (Aff. C, p. 12)

### August 9, 2016 Raised Voice

Mr. Brda averred that he did not recall any "'raised voice' episodes" involving Complainant on August 9, 2016. He advised that it could be possible that he spoke to Complainant on August 9, 2016 in a raised voice, as he stated above, he was known to sometime speak in a raised voice whether excited or frustrated. (Aff. B, p. 12)

Mr. Brda testified that Complainant never told him that this comment constituted a hostile work environment. He asserted that as a result, no action was taken. (Aff. B, pp. 12-13)

### September 7, 2016, Government Property Taken

Mr. Brda testified that on September 7, 2016 he instructed security to take all the Complainant's U.S. Government property. He explained that he instructed Matt Hammersley, Site Security Coordinator to collect Complainant's U.S. Government issued cell phone and consular badge upon Complainant's departure from the "Compound Access Control facility (not the gate) on [Complainant's] pre-arranged final day working on-site." Mr. Brda averred that personnel were required to wear a badge and thus, he had instructed Mr. Hammersley to accompany Complainant to Compound Access Control facility to retrieve the necessary items. (Aff. B. p. 15)

22

Mr. Brda averred that Complainant did not tell him that this action constituted harassment. He asserted that he had not spoken with Complainant since this action on September 7, 2016 and as far as he knew, Complainant did not tell Mr. Hammersley that this constituted harassment. Mr. Brda attested that based on these facts, no action was taken. (Aff. B, pp. 15-16)

## Legal Framework

### Disparate Treatment Discrimination

In analyzing a disparate treatment claim of race, national origin, religion and/or reprisal discrimination, where the agency denies that its decisions were motivated by complainant's membership in the protected group, and there is no direct evidence of discrimination, we apply the burden-shifting method of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this analysis, in order to establish a *prima facie* case, a complainant must demonstrate that he: (1) belongs to a protected class; (2) was subjected to an adverse employment action; and (3) was treated differently in this regard than similarly situated individuals who were not members of the protected group. Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1090 (5th Cir. 1995); Mitchell v. Toledo Hospital, 964 F.2d 577, 582-83 (6th Cir. 1992). The failure to establish a specific element of a *prima facie* case may be overcome by presenting evidence of agency actions from which an inference of discrimination could be drawn if they remained unexplained. Day v. U.S. Postal Service, EEOC Appeal No. 01996097 (September 18, 2000).

The burden of production then shifts to the agency to articulate a legitimate, non-discriminatory reason for the adverse employment action. In order to satisfy his burden of proof, a complainant must then demonstrate by a preponderance of the evidence that the agency's proffered reason is a pretext for disability discrimination. At all times, the ultimate burden of persuasion remains with the complainant. Board of Trustees of Keene College v. Sweeney, 439 U.S. 24, 25 N.2 (1978). The showing of pretext is, in effect, a requirement that the employee show a connection between the alleged basis of discrimination and the action taken; namely, that the agency acted with the requisite discriminatory intent. The complainant can prove intent in one of two ways: "either directly, by showing that a discriminatory reason more likely motivated the agency, or indirectly, by showing that the agency's proffered explanation is unworthy of credence." Ruffin v. Secretary of Navy, EEOC Appeal No. 01A04063 (May 3, 2001).

23

This established analysis in discrimination cases, in which the first step normally consists of determining the existence of a *prima facie* case, need not be followed in all cases.   Lukacs v. Dep't of Health and Human Serv., EEOC Appeal Nos. 01A42055, 01A42142, 01A42145, 01A42227, (Apr. 27, 2005).   Where the agency has articulated a legitimate, nondiscriminatory reason for the action at issue, the factual inquiry can proceed directly to the third step of the McDonnell Douglas analysis, the ultimate issue of whether the complainant has shown by a preponderance of the evidence that the agency's actions were motivated by discrimination.   *Id.*, citing U.S. Postal Serv. Bd. Of Governors v. Aikens, 460 U.S. 711, 713-714 (1983).


## Retaliation

Additionally, to establish a *prima facie* case based on reprisal, a complainant must show that: (1) he or she engaged in prior protected activity; (2) the agency official who took the adverse employment action was aware of the protected activity; (3) he or she was subsequently disadvantaged by an adverse employment action or adverse treatment; and (4) there is a causal link between the protected activity and adverse action/treatment.   Hochstadt v. Worcester Foundation for Experimental Biology, Inc., 425 F. Supp. 318, 324 (D. Mass 1976), *aff'd* 545 F.2d 222 (1st Cir. 1976); Manoharan v. Columbia University College of Physicians and Surgeons, 842 F.2d 590, 593 (2nd Cir. 1988); Coffman v. Department of Veterans' Affairs, EEOC Request No. 05960437 (November 20, 1997); and Whitmire v. Department of the Air Force, EEOC Appeal No. 01A00340 (September 25, 2000).   A complainant may establish prior EEO activity by participating at any stage of the EEO process or opposing unlawful discriminatory conduct.   See, generally, Lewis v. Department of the Navy, EEOC Appeal No. 01810158 (May 22, 1981) (counseling stage); Ballard v. U.S. Postal Service, EEOC Appeal No. 01923276 (August 17, 1992) (witness); and Burrough v. U.S. Postal Service, EEOC Appeal No. 01842417 (June 24, 1986) (representative).

A complainant may also establish a *prima facie* case by presenting evidence which, if it was not explained, would reasonably give rise to an inference of reprisal. Shapiro v. Social Security Administration, EEOC Request No. 05960403 (December 6, 1996).   Obviously, the complainant must offer evidence that the agency officials who took the action were aware of his or her prior participation or opposition activity (Demeier v. Department of the Air Force, EEOC Appeal No. 01A11166 (May 23, 2002)) but establishing that alone will not enable a complainant to establish the causal connection element of a *prima facie* case.   Garcia-Gannon v. Department of the Air Force, EEOC Appeal No. 01821195 (June 30, 1983).   Adverse

24

actions need not be ultimate employment actions, just adverse treatment based on a retaliatory motive, which could deter a reasonable person from engaging in protected activity. Burlington Northern Santa Fe Railway Company v. White, 548 U.S. 53 (2006); Lindsey v. U.S. Postal Service, EEOC Request No. 05980410 (November 4, 1999) and *EEOC Compliance Manual*, Section 8.D.3, Notice No. 915.003 (May 20, 1998).

The causal connection may be inferred by evidence that the protected conduct was closely followed by the adverse action. Clark County School District v. Breeden, 532 U.S. 286 (2001). The Court in Breeden noted that where a complainant is relying on temporal proximity to establish a causal connection between prior protected activity and a current adverse employment action, that proximity must be "very close" and cited with approval Circuit Court of Appeals decisions holding that time gaps of three to four months between an individual's prior EEO activity and the current adverse employment action were too attenuated to suggest an inference of retaliation. The Commission has followed suit and rendered decisions establishing much shorter time frames to establish the requisite temporal proximity. See, for example, Heads v. U.S. Postal Service, EEOC Appeal No. 01A51547 (June 2, 2005); Archibald v. Department of Housing and Urban Development, EEOC Appeal No. 01A54280 (September 22, 2005); and Lynch v. U.S. Postal Service, EEOC Appeal No. 01A24705 (August 14, 2003).

## Hostile Work Environment

To establish a claim of harassment a complainant must show that: (1) he or she belongs to a statutorily protected class; (2) he or she was subjected to unwelcome verbal or physical conduct involving the protected class; (3) the harassment complained of was based on the statutorily protected class; (4) the harassment had the purpose or effect of unreasonably interfering with his or her work performance and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer. McCleod v. Social Security Administration, EEOC Appeal No. 01963810 (Aug. 5, 1999).

The environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. Harris v. Forklift Systems, Inc., 510 U.S. 127, 21-22 (1993).

Courts must consider the totality of the instances of harassment together rather than piecemeal, to determine if the acts are severe and pervasive enough to alter the conditions of the workplace. Harris, 510 U.S. at 23. This includes taking into

account the frequency and severity of the alleged discriminatory conduct, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with Complainant's work performance.  Harris, 510 U.S. at 23.  Casual comments of accidental or sporadic conversation will not trigger equitable relief. Under Title VII, more than a few isolated incidents of harassment must have occurred. Faulkner v. Dep't. of Commerce, EEOC Appeal No. 01890522 (1989).

Moreover, while a complainant may endure difficult or frustrated common workplace occurrences, such personnel actions will not suffice to meet the severe or pervasive standard unless they are objectively offensive, abusive or hostile, and otherwise taken to harass an individual.  See Tiller-Hill v. Dep't of Treasury, EEOC Appeal No. 01962037 (1998) (personnel actions such as increased workload review and unfavorable performance ratings not found to meet severe or pervasive standard); Wolf v. U.S. Postal Service, EEOC Appeal No. 01961559 (July 27, 1998) (changes in work responsibilities or in workplace policies and procedures not found to meet severe or pervasive standard).

**Legal Analysis**

The Commission has held that allegations of harassing conduct that include discrete acts that would independently state claims outside of a harassment framework, assuming that they are timely, are properly reviewed in the context of disparate treatment.   Conlin v. Department of Veterans Affairs, EEOC Appeal No. 0120055310 (December 5, 2006).

The Supreme Court has held that a discrete retaliatory or discriminatory act "occurred" on the day that it "happened" so that the plaintiff could only file a charge which covered discrete acts which "occurred" within the appropriate time period for filing.  However, the Court also determined that a hostile work environment can properly consist of both discrete and non-discrete acts which fall both within and outside the filing period so long as one of the acts which comprise the claim falls within the filing period.  Untimely discrete acts may be considered as background evidence in support of the hostile environment claim. National Railroad Passenger Corporation v. Morgan, 536 U.S. 101 (2002).  The Supreme Court does not define the term "discrete act", only using the term to contrast with a hostile work environment claim which would involve"…the cumulative affect of individual acts" in the Court's view.  Nevertheless, the Court references 42 U.S.C. 2000e-2(a) and its prohibition of discrimination in hiring, discharge, and compensation and later adds failure to promote and denial of a transfer as examples of discrete acts which

26

must themselves be the subjects of timely filings.  Generally speaking, a discrete act is an action which is of such a nature or has such a consequence as would move a reasonable person to act to protect his or her rights.  As to timeliness, EEOC Regulation 29 C.F.R. § 1614.105(a)(1) requires that discrete acts of discrimination be brought to the attention of the EEOC within 45 days.

In the instant case, Complainant's initial contact with the EEO Office was on October 7, 2016, thus, Claim #1 (removal) and all allegations in Claim #2 beginning August 23, 2016 are considered timely.  (Counselor's Report, p. 1)  Therefore, only Complainant's allegation of having his Government property taken on September 7, 2016 would be considered timely along with Claim #1; all other allegations in Claim #2 are considered untimely.  Additionally, a review of the two timely claims reveals that only Claim #1 would independently state a claim outside of a harassment framework, thus, only this claim will be analyzed in this section.  Claim #2, which is comprised of both untimely and non-discrete acts, will be addressed in the Harassment/Hostile Work Environment section.

As addressed above, Complainant identified his race and national origin as "Asian-Pakistani" and his religion as "Islam – Muslim".  (Aff. A, pp. 5-6)  In addition, in viewing the evidence in the light most favorable to Complainant, he had participated in protected activity as he raised claims of harassment to Mr. Foster regarding comments by Mr. Brda in September and October of 2015; as well as raising issues of discrimination on September 3, 2016, three days prior to the decision not to exercise the one-year option on his contract with the DOS.  Consequently, Complainant has established membership in every asserted protected group.  Furthermore, Complainant has established that he was subjected to adverse employment actions as he was removed from the Karachi project.  Thus, Complainant did suffer adverse actions as to this claim.

However, Complainant has failed to establish that the Agency treated him differently from other persons outside of his race, national origin, religion and/or reprisal under similar circumstances.

## Claim #1 – Complainant was removed from his position as a third-party contractor with SRC

Complainant attested that Mr. Alvi (Asian, Pakistani, Muslim) and Mr. Benson (White, American, Religion Unknown) were similarly situated and not removed after 11 months and 7 days.  (Aff. A, pp. 15-16)  This evidence alone belies the assertion of discrimination based on race, national origin and/or religion, as Mr. Alvi

was retained beyond one year. In addition, Mr. Brda testified that in the last twenty-four months, they did not have any other cleared third-party contract Civil Engineers, under his supervision, that were similarly situated to Complainant, but were not removed. He explained that they did have one locally hired third-party contract Civil Engineer, one locally hired third-party contract Mechanical Engineer, and one locally hired third-party contract Safety Inspector who were employed on the project for different periods of time. Mr. Brda advised that they also had one SRC cleared American third-party contractor, Mechanical Engineer (Mr. Alvi) and one SRC cleared American third-party contractor, Electrical Engineer (Benson). He identified that four of the five employees were Asian, Muslim and of Pakistani origin. Mr. Brda maintained that the five employees' services remained in demand. He also maintained that two SRC employees continued to contribute in meaningful ways to the project in their competencies and seemed interested in continuing with the project, unlike Complainant. Mr. Brda testified that locally hired third-party contract Civil Engineer, Adeel Nazim (Asian, Muslim, Pakistani) was not performing as expected and he was terminated. (Aff. B, pp. 9-11, 23) Mr. Foster attested that neither Mr. Alvi nor Mr. Benson were removed from their third-party contract. (Aff. C, p. 9)

Nothing in the treatment of the aforementioned employees infers discrimination based on race, religion, national origin and/or retaliation. Mr. Alvi, to the extent he and Complainant were similarly situated, was retained by Mr. Brda under the SRC contract. In addition, the remaining employees retained by Mr. Brda included three other, Asian, Muslim, Pakistani, employees. Therefore, Complainant has failed to establish the third element of his *prima facie* case as it relates to Claim #1. Moreover, as detailed below, Complainant cannot establish that management's rationales were pretextual.

Complainant disagreed with management's explanation as to why he was removed. He maintained that on 50% of the Civil Work for the construction had been done and the contractor was late. Complainant asserted that his signed contract with SRC indicated that his position was for 18 months and was subject to extension. He advised that Mr. Brda, Mr. Foster and Ms. Price retaliated and wrongfully terminated his written employment contract. Complainant testified that Mr. Brda and Mr. Foster had full knowledge that he had made reports to OIG about "corrupt construction practices as this project. They retaliated against [him] and breach[ed] the employment contract." (Aff. A, p. 12)

Complainant attested that Mr. Brda and Mr. Foster violated the terms of his employment contract with SRC and wrongfully terminated him. He asserted that

28

they were aware that he had reported them to the OIG and that the OIG was investigating them. Complainant maintained that the evidence exists and was transmitted to the OIG for investigation. (Aff. A, pp. 12-13)

The record evidence does not support a finding that management's explanation as to why Complainant was terminated was untrue and Complainant was actually discriminated against based on the action.

Complainant averred that his race and national origin were factors because the EEO laws mandate that a person cannot be hired or fired base on national origin. He advised that Mr. Brda should not be allowed to discuss and make comments on his national origin as he did on two occasions during the interview and at work in the presence of other employees. Complainant expressed that Mr. Brda stated that the only reason he was hired was because of his Pakistani origin. He opined that Mr. Brda's evidence of discriminatory intent based on race and national origin was evidenced by him "not answering or returning [his] phone calls, raising voice at [him], comment like we/OBO is paying you lots of money, stop talking to me [sic]." Complainant asserted that he was removed because Mr. Brda was not pleased with his presence on-site and that his national origin was a strong factor. (Aff. A, p. 13) As addressed immediately, this evidence is negated by Mr. Brda's treatment and retention of Mr. Alvi and several other contractors of Complainant's same race and national origin.

Complainant testified that he did not believe that his religion was a factor in his termination. (Aff. A, p. 13) Thus, Complainant presented no evidence of pretext or an inference of discriminatory animus based on his religion.

Complainant demurred that his prior protected activity was a factor because Mr. Brda and Mr. Foster had full knowledge of his contacts with OIG. He maintained that after his meeting was denied with the OIG in May of 2017, he was subjected to more discrimination and they started ignoring his presence. Complainant explained that his desktop computer was crashed and he lost all his data; and on September 4, 2016 he met with an EEO representative. He advised that the EEO representative stayed in the same apartment complex as Mr. Brda and Mr. Foster and on September 7, 2016 they retaliated against him by removing him. (Aff. A, pp. 13-14) There is no evidence in the record to support Complainant's attributions of knowledge of his EEO activity to Mr. Brda and/or Mr. Foster. The record is devoid of any evidence that OIG was upset or concerned about having missed any meeting with Complainant. Further, Complainant had been given information on how to contact the OIG through the fraud hotline. There is not a scintilla of evidence to support any

29

contention that management was aware of and prevented Complainant's meeting with the OIG. Moreover, Complainant has offered no evidence to rebut management's assertion that his performance was deficient and was no longer required for the project.

Nothing in Complainant's contentions supports his belief that Mr. Brda violated his contract of employment by not exercising the DOS one-year option. Moreover, the record is clear that the termination decision was made by SRC and not the DOS.

Based on the foregoing, Complainant has not satisfied his burden of showing, by a preponderance of the evidence that the explanations provided by management as to his performance and the need for his services were false and instead were because of his race, national origin, religion and/or prior EEO activity.

A complainant always bears the ultimate burden of persuasion in proving that the agency intentionally discriminated against him. U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 716 (1983). In the instant matter, Complainant failed to meet such a burden. In Love v. U.S. Postal Service, EEOC Request No. 05890328 (May 26, 1989), the Commission held: We agree with the court in Watson v. Megee Women's Hospital, 472 F.Supp. 325 at 330 (D.C. PA 1979): "That an employment decision is unfortunate for the employee, unwarranted, unkind, or even unprincipled is not enough--at least, not enough to support a Title VII action. To permit such an action to succeed, without clear proof of a link between the plaintiff's protected status and the adverse employment decision, would cause Title VII to become a vehicle for providing compensation following an adverse employment decision to every person in a protected class — that is, to every citizen of either sex, any race, origin or nationality. Although all citizens are protected under Title VII, they are protected only against the specific harm of invidiously discriminatory preference by employers."

Regarding his allegations of being subjected to a hostile work environment (Claim #2) It is undisputed Complainant has fulfilled the first element because of his membership in the protected classes of race, national origin, religion and participation in prior EEO activity by voicing opposition to discrimination.

Turning to the second and third elements of his harassment claim, however, Complainant must establish that management subjected him to personal slurs or other denigrating or insulting verbal or physical conduct relating to his protected classes.

30

Complainant's description of the issues, as well as management's responses and Complainant's pretext evidence for Claims #1 and #2 was set out in detail above. A review of those claims confirmed that there was no other evidence relevant to the analysis for harassment.

As to Claim #2, the conduct in question is evaluated from the standpoint of a reasonable person, considering the context in which it occurred, including the severity and frequency of the conduct and its effect on the employee's work performance. Harris, *supra*.

## Claim #2 – Complainant was subjected to a hostile work environment, characterized by, but not limited to inappropriate comments, humiliation, and false accusations

### *October 2, 2015 Comment*

Complainant maintained that the October 2, 2015 comment by Mr. Brda that it was a benefit that he was Pakistani created a hostile work environment because it was "not appropriate and was not normal to make such types of comments. It was against the EEOC laws." He asserted that it appeared that Mr. Brda had no choice but to hire him. Complainant countered by testifying that he was provided to Mr. Brda based on his experience. He advised that this comment mentally disturbed him and made him start feeling uncomfortable. (Aff. A, p. 19)

### *October 15, 2015 Comment*

As to Complainant's claim that Mr. Brda "raised his voice", he testified that he believed that Mr. Brda would proceed on his inquiries about faulty construction, but instead he was "harassed, humiliated and mentally disturbed due to [Mr. Brda's] attitude." He maintained that he was "afraid" and felt that Mr. Brda did not like him and would fire him. Complainant expressed that he was uncomfortable with Mr. Brda and was afraid to express his independent opinion, which in turn impacted his performance. (Aff. A, pp. 19, 20)

### *November 2015, Accused of Falsifying Hours*

Complainant maintained that Mr. Brda's questioning of his hours was "very painful and disturbing" and he had been humiliated in front of 50 workers. He opined that Mr. Brda was accusing him of something without any evidence. Complainant asserted that Mr. Brda told him that effective immediately he would not be allowed

31

to stay late to provide coverage to contractors' construction activities; even though construction activities were "100%" the responsibility of Civil Engineering. He attested that everyone was asking him why he had been removed from overtime and he had no response and felt insulted. (Aff. A, pp. 20, 21)

## *November 2015, Town Hall Meeting*

Complainant averred that this statement by Mr. Foster, of denying his attendance at the November 2015 Town Hall Meeting with the Ambassador, caused him to be harassed and mentally disturbed as this was not a normal situation. (Aff. A, p. 22)

## *May 17, 2016 OIG Meeting*

Complainant attested that being blocked from the OIG meeting caused him to feel "afraid, threatened and mentally disturbed" due to Mr. Foster's unusual attitude. He maintained that he was ignored by the OIG Inspector. (Aff. A, p. 23)

## *August 9, 2016 Raised Voice*

Complainant advised that Mr. Brda's comment made in a low voice on August 9, 2016 was threatening and harassing. He explained that he was "afraid" and informed Mr. Alvi that he was sure he would lose his job; a fact confirmed three weeks later. (Aff. A, pp. 24, 25)

## *September 7, 2016, Government Property Taken*

Complainant maintained that the actions at the security gate caused him to feel harassed and humiliated. He attested that it caused him to be depressed and to suffer anxiety for several weeks. Complainant advised that he felt like he was being treated like a criminal without any reason. He averred that the method to retrieve U.S. Government property was unprofessional and violated DOS policies. Complainant testified that he "was threatened and harassed by the security coordinator and was mentally torched." (Aff. A, pp. 25-26)

Complainant summarized that these incidents caused him to be "very depressed, mentally torched and [to] suffer[] anxiety for several weeks [sic]." (Aff. A, p. 26) The record is clear that there were several, sporadic comments, on October 5th, 15th, 2015 and August 9, 2016. The three comments are innocuous on their face and do not contain any vitriol or harsh language on the part of the speaker. Furthermore, Complainant was not instructed not to attend Town Hall Meetings and his U.S.

Government property was only confiscated after his termination. While a reasonable person may not have found these acts to constitute a hostile work environment, and in viewing the evidence in the light most favorable to Complainant, it is clear that Complainant found these incidents as unwelcome. Thus, in sum, Complainant proved the second element of his claim of hostile work environment as to each of his claims.

Turning to the third element, whether the events in question were based on Complainant's protected classes, as detailed below, Complainant has offered no evidence that he was treated differently because of his race, national origin, religion and/or EEO activity.

Complainant disagreed with management's explanations and/or responses to his claims of harassment. However, Complainant offered no specific rebuttal to management's responses to each of the allegations. (Aff. A, pp. 52-53; FAD Request and Rebuttal, pp. 3-4)

Complainant maintained that his race was a factor because management underestimated his abilities. He explained that management did not trust him and considered him as a "lower class human being." Complainant advised that he had earned a "lot of respect from the contractor (Epik) and demonstrated as high quality professionalism with excellent background and experience." He averred that Epik always contacted him first to seek his opinion in resolving issues. Complainant testified that Epik's staff informed him on several occasions that Mr. Brda and Mr. Foster were jealous of him. (Aff. A, pp. 26-27) The record establishes that the DOS determined that Complainant's services were not a benefit to the DOS and his services were no longer needed. There is no evidence that Complainant's race was a factor as Mr. Alvi, another SRC third-party contractor, who was of the same race as Complainant was retained beyond his first year. There is no evidence to support the contention that Mr. Foster and Mr. Brda found Pakistani employees to be "lower class human beings." Furthermore, there is no evidence that Mr. Brda sought another Civil Engineer, of a different race, from SRC to help complete the project.

As to his religion being a factor, Complainant attested that he did not have any evidence of such. He asserted that all he had was general talk and discussion about politics and religion and beliefs between Mr. Brda, Mr. Foster, Mr. Benson, Mr. Alvi and him. (Aff. A, p. 27) This evidence is belied from the unrefuted record that there were several Muslim employees working under Mr. Brda.

33

Complainant opined that his national origin was a factor because of his "general appearance, body structure and light brown skin color." (Aff. A, p. 27)  As with his race, there is not a scintilla of evidence to support this contention.

Complainant demurred that his prior protected activity was a factor because Mr. Brda and Mr. Foster had full knowledge of his scheduled meeting with the OIG and Mr. Foster purposely blocked that meeting.  He maintained that following that action the discriminatory behavior increased.   Complainant opined that both were aware that he met with an EEO representative on September 4, 2016. (Aff. A, p. 27)  There is no evidence that Mr. Foster and Mr. Brda were aware that Complainant met with an EEO representative on September 4, 2016.  The record is devoid of any evidence that Mr. Brda and Mr. Foster had any knowledge of Complainant meeting with the OIG.  The record is clear that the OIG had scheduled an inspection of U.S. Mission Pakistan in May of 2016, but there was no indication to either Mr. Brda or Mr. Foster that the OIG was meeting with Complainant, let alone, meeting to discuss issues of harassment.  In addition, the speculative nature of this contention by Complainant is highlighted by his testimony that the EEO representative lived in the same apartment complex as both Mr. Foster and Mr. Brda and thereby somehow evidenced her divulging her meeting with him.   There is nothing in the record to support this conclusion by Complainant.  Nothing in this evidence infers reprisal.

In viewing Complainant's allegations as a whole, he failed to establish that any of management's actions associated with the matters raised were based on either of his protected classes.  Thus, he has failed to establish the third element of his *prima facie* case of being subjected to a hostile work environment.  Assuming for the sake of argument only, that Complainant had satisfied the third element of his claim of harassment, the analysis will continue below.

As to the fourth element, in order for harassment to be considered discriminatory, it must be severe or pervasive.  Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993). Although actual psychological or emotional injury is not required, unless the conduct is very severe, a single incident or group of isolated incidents will not be regarded as discriminatory harassment.   Scott v. Sears Roebuck and Co., 798 F.2s 210 (7th Cir. 1986); Hansen v. Rice, EEOC Appeal No. 01920621 (September 10, 1992). "Harassment, as the term is used in Title VII cases, refers to more than being subjected to stress."   Lin v. U.S. Postal Service, EEOC Appeal No. 01932880 (December 23, 1993).   The conduct in question should be evaluated from the standpoint of a reasonable person, taking into account the particular context in which it occurred.  Highlander v. K.F.C. National Management Co., 805 F.2d 804 (6th Cir. 1986).  Conduct that is not severe or pervasive enough to create an objectively hostile

or abusive environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview. Harris, 510 U.S. at 22-23. A showing of discriminatory harassment "must include discrete comments directed against the complainant or disparate treatment which supports an inference of discriminatory harassment." Lin, *supra*.

Further, the Commission has also agreed with the courts and held that in order to establish a case of harassment that constitutes a hostile work environment, the harassment must be ongoing and continuous and that a few isolated incidents will not be sufficient to constitute discriminatory harassment. McGivern v. U. S. Postal Service, EEOC Request No. 05930481 (March 17, 1994) and Vargas v. Department of Justice, EEOC Request No. 05931047 (October 7, 1993). The conduct involved must be viewed in the context of the totality of the circumstances including, among other things, the nature and frequency of the offensive encounters and the time span over which the encounters occurred. Rabidue v. Osceola Refining Company, 805 F.2d 611, 620 (6th Cir. 1988) and Gilbert v. City of Little Rock, 722 F.2d 1390, 1394 (8th Cir. 1993).

Even assuming Complainant's version of the events were correct, his descriptions of the events did not include any abusive language on the part of management or any other conduct which would be viewed as harassment. None of his accounts of the allegedly discriminatory events included any evidence of denigrating or insulting conduct on the part of management. Complainant referenced only two comments by Mr. Brda, during a one-year tenure, which his Pakistani heritage was even raised by Mr. Brda. A thorough analysis of those comments, as described by Complainant revealed poignant comments about how Complainant's race and national origin was an asset to the position in Pakistan. The courts have held that more than a few isolated incidents of enmity based on race, gender, national origin, religion, etc. must have occurred. Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981) and Cariddi v. Kansas City Chiefs Football Club, Inc., 568 F.2d 87, 88 (8th Cir. 1977. There must have been a steady barrage of opprobrious comments and not a casual comment or accidental or sporadic conversation in order to trigger an entitlement to relief. Snell v. Suffolk County, 782 F.2d 1094 (2nd Cir. 1986). A review of the testimonial evidence fails to establish that there was a constant barrage of language or conduct from management that was insulting or denigrating to Complainant.

In order to constitute harassment, the conduct complained of must be objectively offensive. Routine work assignments, instructions, and admonishments do not rise to the level of discriminatory harassment. DiFruscio v. Social Security Administration, EEOC Appeal No. 01982006 (September 13, 2000). Record

35

evidence confirmed that management's exchanges with Complainant were work-related and the record confirmed that Complainant's allegations did not rise to the level of harassment or would lead a reasonable person to believe it was a hostile work environment.   Although Complainant was clearly dissatisfied with management's responses to his input on construction projects, the anti-discrimination laws are not a "general civility code"; in order to constitute harassment, the conduct complained of must be so objectively offensive as to alter the terms and conditions of her employment.  He has not made such a showing. Despite his attempt to inflate his consternation with management's lack of acquiescence to his concerns into a hostile, abusive, or offensive work environment or one which unreasonably interfered with his work performance, the fact remains that the incidents he raised are minor, transitory and ephemeral in nature, and do not come anywhere near the level of seriousness and severity necessary to meet this requirement, even when taken together and weighed in their entirety.  Complainant testified that these actions caused him to feel threatened and humiliated which impacted his ability to perform his duties.  (Aff. A, p. 27)  However, as the record revealed, management took no action against Complainant based on his inquiries into the handling of the construction projects; and instead management encouraged him to contact OIG to report his concerns.  The record is clear that Complainant contacted OIG and attempted to meet with them.  However, and more importantly, the record is devoid of any evidence that Mr. Brda or Mr. Foster prevented Complainant from any contact with OIG.  In addition, the record is clear that Complainant was not disciplined for his performance issues and Mr. Foster made attempts to counsel him through his issues and to clarify his job duties.  Nothing in management's responses to Complainant's inquiries and concerns were offensive. Accordingly, Complainant does not prevail on his discriminatory harassment claim.

Therefore, as to element four, Complainant has not proven that he was subjected to an abusive work environment in violation of Title VII.  Considering both the totality of the acts described herein, and taking into account the context in which these issues occurred, Complainant has not shown that he was subjected to conduct that was sufficiently severe or pervasive that it created a hostile, abusive, or offensive work environment or unreasonably interfered with his work performance.

For the fifth and final element of a *prima facie* case of harassment, Complainant must demonstrate that there is a basis for imputing liability to the Agency.  To prove this element, Complainant must have first met his burden under elements 1-4 and then demonstrated that he reported the alleged conduct to Agency officials who then failed to take immediate and effective remedial action.  While Complainant met his burden under elements 1 and 2, he failed to meet his burden under elements 3 and 4;

therefore, this element immediately fails and there can be no basis on which to impute liability to the Agency.

Complainant offered that he informed Ms. Price, via telephone, on several occasions that he was being subjected to a hostile work environment. He asserted that Ms. Price always agreed with his observations and feelings. Complainant testified that on September 3, 2016 he again notified her of the hostile work environment but she took no action and instead directed that he leave the site. He further testified that on September 4, 2016 he contacted the EEO representative in Karachi but she was not willing to take any action and instead referred him the EEO representative in Islamabad. (Aff. A, p. 28)

Complainant denied that he spoke directly to Mr. Foster and/or Mr. Brda. He maintained that he was "afraid of them." Complainant admitted that he had received training on hostile work environment on October 2, 2015. He denied however, that the anti-harassment policy was posted at the office. (Aff. A, pp. 28-29)

Mr. Brda averred, as addressed above, that Complainant never told him that these actions constituted harassment. He advised that Complainant did mention in his September 3, 2016 email to Ms. Price that he was subjected to a hostile work environment but did not specify any acts by any employee to suggest that a hostile work environment had been created. Mr. Brda asserted that the email was not shared with the DOS until September 7, 2016. (Aff. B, pp. 17, 18, 19)

Mr. Brda also averred that he had received anti-harassment/hostile work environment training while employed at the DOS. (Aff. B, p. 19)

Mr. Foster attested that Complainant failed to inform him that he felt that anyone's actions constituted a hostile work environment. He asserted that he recalled Complainant claiming that Mr. Brda had been unprofessional, but never claimed that it was a hostile work environment. Mr. Foster opined that he was not aware of any investigation being conducted into Complainant's allegations of a hostile work environment as Complainant never filed any complaint that would have triggered an investigation. (Aff. C, pp. 13-14)

Mr. Foster testified that he had received anti-harassment training. (Aff. C, p. 14)

Based on the totality of the circumstances, and considering all of Complainant's allegations, Complainant has not shown that he was subjected to a hostile work

37

environment based on his membership in any protected class. If the actions did occur, there is no basis to impute liability on the Agency

## Statement of Conclusions

Assuming, without so finding, that Complainant articulated a valid *prima facie* case of discrimination based on race, national origin, religion and/or reprisal, the Agency has offered legitimate, non-discriminatory reasons for its actions. Complainant provided insufficient evidence to show the Agency's reasons for its actions were pretextual. Accordingly, the Agency finds that Complainant has not established his claim of discrimination.

## Statement of Relief

Complainant has not prevailed on his claim of discrimination. Accordingly, no relief is awarded.

for  Gregory B. Smith, Director
Office of Civil Rights

Date: 8/17/17

38